UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | ) ) ) Civil Action No. 4:12-cv-1834 |
| Plaintiff, | ) ) ORDER FOR ENTRY ) OF FINAL JUDGMENT BY DEFAULT |
| v. | ) AGAINST CHRISTOPHER D. DALEY ) AND TC CREDIT SERVICE, LLC d/b/a |
| CHRISTOPHER D. DALEY and TC CREDIT SERVICE, LLC d/b/a DEL-MAIR GROUP, LLC, | ) DEL-MAIR GROUP, LLC ) ) ) ) |
| Defendants. | ) ) ) |

This matter is before the Court on Plaintiff U.S. Commodity Futures Trading Commission's ("Commission" or "CFTC") Motion for Entry of Final Judgment by Default Against Christopher D. Daley and TC Credit Service, LLC d/b/a Del-Mair Group, LLC ("Motion for Default Judgment"). For the reasons stated below and good cause having been shown, the Commission's Motion for Default Judgment is GRANTED.

### I. PROCEDURAL HISTORY

On June 18, 2012, the Commission filed a Complaint for Injunctive and other Equitable Relief and for Civil Penalties ("Complaint") against Christopher D. Daley ("Daley") and TC Credit Service, LLC doing business as Del-Mair Group, LLC ("DMG")(collectively, "Defendants") alleging violations of Sections 4b(a)(1)(A)-(C) of the Commodity Exchange Act (the "Act"), 7 U.S.C. §§ 6b(a)(1)(A)-(C) (Supp. III 2009), as amended by the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, Title XIII (the CFTC Reauthorization Act (the "CRA")) §§ 13101-13204, 122 Stat. 1651 (to be codified at 7 U.S.C. §§ 1, et seq.)(enacted June 18, 2008), and Sections 4o(1) and 4m(1) of the Act, 7 U.S.C. §§ 6o(1)

1

and 6m(1) (2006) and Commission Regulation ("Regulation") 4.20(c), 17 C.F.R. §4.20(c) (2011). The Complaint, among other things, alleges that from at least January 2010 and continuing through November 2011 (the "Relevant Period"), Defendants fraudulently solicited members of the public to participate in a commodity pool (the "Pool") to trade crude oil futures, misappropriated participants' funds, and issued false statements to conceal the fraud. The Complaint seeks, *inter alia*, injunctive relief, disgorgement, restitution, and civil monetary penalties.

On June 28, 2012, Defendants were properly served with a copy of the summons and of the Complaint. To date the Defendants have failed to obtain counsel, enter an appearance or otherwise defend this action. On August 6, 2012, the Clerk of the Court entered defaults against the Defendants for failure to respond to the Complaint or otherwise defend the action pursuant to Federal Rule of Civil Procedure 55(a).

The Court has carefully considered the Complaint, the factual allegations of which are well-pleaded and hereby taken as true, the memorandum the Commission filed in support of its Motion for Default Judgment and supporting declarations and exhibits, and, being fully advised and familiar with the record in this matter, hereby enters findings of fact and conclusions of law, and issues a final order of permanent injunction that also provides for restitution, a civil monetary penalty and ancillary relief pursuant to Section 6c of the Act, 7 U.S.C. §13a-1 (2006), as set forth herein.

**THE COURT FINDS:**

## II. FINDINGS OF FACT

### A. Jurisdiction and Venue

This Court has jurisdiction over this action pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1, which authorizes the Commission to seek injunctive relief against any person whenever

it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of the Act or of any rule, regulation, or order thereunder. As discussed below, the Commission has jurisdiction over the conduct and transactions at issue in this case pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), and Section 2(c)(2) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 2(c)(2).

Venue is also appropriate in this Court pursuant to Section 6c(e) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 13a-1(e), as Defendants transact business in this District and the transactions, acts, practices, and courses of business alleged in the Commission's Complaint occurred, are occurring, or are about to occur within this District.

**B. Defendants**

Defendant **TC Credit Service, LLC** is a North Carolina limited liability company operating from Houston, Texas and d/b/a "**Del-Mair Group, LLC**." Del-Mair Group, LLC is not a legal entity in any state. Del-Mair Group, LLC's website at www.delmairgroup.com describes the business as a private independent financial brokerage, specializing in private funding, corporate funding, and credit leveraging as well as international financial instruments, that offers financial consultation for corporate credit, small business owners and real estate tycoons. Neither TC Credit Services, LLC nor Del-Mair Group, LLC have ever been registered in any capacity with the Commission.

Defendant **Christopher Daley** resides in Houston, Texas. Daley is the owner of DMG. Daley was the only signatory for three futures trading accounts held in his name at TransAct Futures ("TF") and Rosenthal Collins Group, LLC ("RCG"), both registered futures commission merchants ("FCMs"). During the Relevant Period, Daley traded crude oil, natural gas, and index

futures contracts in these accounts. Daley has never been registered in any capacity with the Commission.

### C. Defendants' Operation

During the Relevant Period, Daley controlled the operations of DMG. Daley is the sole owner and sole employee of DMG. Daley is the only signatory on each of TC Credit Service LLC's bank accounts and the only authorized trader on the trading accounts into which he directed a portion of pool participants' funds.

Daley solicited and accepted funds from prospective and actual pool participants to participate in the Pool for the purpose of trading New York Mercantile Exchange ("NYMEX") crude oil futures contracts through the Pool. Daley obtained pool participants through Daley's direct solicitations and through word of mouth. Daley solicited participants through personal meetings and by telephone.

Daley distributed to prospective pool participants account opening documents that made false representations about Daley's experience as a trader and guaranteed twenty percent (20%) to sixty percent (60%) monthly returns on deposits. DMG's account opening documents instructed prospective pool participants to wire their funds to an account at Bank of America held in the name of "TC CSERVICE," or make a check payable to "TC C Services, LLC." The managed account trading agreement provided that a pool participant's "account must be opened with a minimum deposit of $5,000 USD."

The agreement also provided for fees to DMG. The agreement stated that DMG will be paid a monthly commission of thirteen percent (13%) of the gross profits for the month, but only if the pool participant received their twenty percent (20%) return for the month. In addition, the agreement provided that DMG would receive a five percent (5%) annual maintenance fee

4

payable yearly on January 31. In or about November 2010, Daley issued revised agreements to pool participants that contained edited language regarding fees and bonus payouts but otherwise remained similar to the original agreements.

During the Relevant Period, Daley emailed pool participants monthly account statements falsely representing that their accounts were making net monthly returns, typically about twenty percent (20%) per month. In July 2011, Daley sent an email to pool participants informing them that the fund "took a tremendous (98 percent) loss in the market in the past few months." Defendants have failed to return principal deposits to at least some pool participants despite their repeated requests.

### D. Daley's Trading

At no time during the Relevant Period did DMG maintain any commodity interest trading account in its name or the name of the pool with any registered FCM. However, Daley maintained three personal commodity interest accounts in his name - two accounts at TF and one account at RCG. Other than these accounts, Daley had never controlled or maintained any other commodity interest accounts at any FCM. Daley opened an account in his name at TF in July 2010 and another in December 2010. Daley traded crude oil, natural gas, and index futures contracts in these accounts. In the account application for these accounts, Daley falsely claimed that he had four years of commodity trading experience.

Daley was the only authorized trader on both TF accounts. During the Relevant Period, Daley deposited approximately $173,000 into the TF accounts, $1,720 was withdrawn from these accounts, and $171,279.84 was lost in trading. Wire transaction records indicate that these accounts were funded from Daley's personal bank accounts. Both accounts lost money every month they were traded and both were closed on June 2, 2011.

In June 2010, Daley opened a trading account in his name at RCG. Daley was the only authorized trader for this account. In the account application for this account, Daley falsely claimed that he had three years of commodity trading experience. During the Relevant Period, a total of $22,700 was deposited into the RCG account, $22,221.58 was lost in trading, and $448.42 was transferred back to Daley's personal bank account. Daley traded crude oil futures contracts in the account. This account lost money each month it was traded except for June 2010, in which it made approximately $639. Daley stopped trading in this account in September 2011 and it was closed in November 2011.

### E. Daley's Misappropriation of Pool Participants' Funds

During the Relevant Period, pool participants deposited approximately $1,427,688.52 into Bank of America accounts held in the name of TC Credit Services, LLC. Daley misappropriated pool participants' funds by using these funds to pay other pool participants' purported returns, to pay for his personal expenses, and to trade in his personal commodity interest accounts.

Daley paid approximately $773,505 in purported returns to pool participants from the TC Credit Services, LLC bank accounts. Because there were no actual trading profits, the purported returns paid to pool participants came from existing pool participants' original deposits or funds deposited by new pool participants rather than any returns generated by Daley's trading. Thus, all funds paid to pool participants as purported returns were misappropriated.

Additionally, during the Relevant Period, Daley withdrew approximately $370,000 in pool participants' funds from TC Credit Service, LLC's bank accounts to which he was not entitled, including, approximately $11,700 in ATM withdrawals, $1,300 in cash advances using the accounts' check cards, $219,000 in counter debits and $138,000 in bank teller assisted cash

withdrawals. Daley also used at least $100,000 to pay for personal expenses such as rent and personal loan payments.

During the Relevant Period, Daley also deposited $195,000 of pool participants' funds into three personal commodity interest accounts held in his name. Daley used these funds to execute futures transactions in these trading accounts. Since these funds were not deposited into any trading account held in the name of DMG or the pool and because Daley was not authorized to use these funds for his personal trading accounts, these funds were misappropriated.

### F. Daley's Material Misrepresentations and Omissions

During the Relevant Period, Daley, in the course of his solicitation of actual and prospective pool participants and throughout the period of time that such individuals remained pool participants, made misrepresentations and omissions of material fact. Based on Daley's misrepresentations and omissions, actual and prospective pool participants entered into agreements and deposited funds with DMG. During the Relevant period, Daley distributed to prospective pool participants a Managed Trading Agreement which stated, in part:

> Del-Mair Group will pay the investor a minimum monthly target return of Twenty Percent (20%) on amount invested for that month. Investor may withdraw their return each month or compound each monthly return for a higher monthly payout...Del-Mair also agrees that every quarterly reporting month investor will receive a larger return on their invested amount. The larger return may range from forty percent (40%) to sixty percent (60%) of the account invested amount at that time. The larger return will be referred to as "Bonus Return Percentage."

The cover letter accompanying the Managed Account Agreement and other account opening documents stated in part "At the start of my career back in 2002 I was lucky enough to have done well even till this day."

Additionally, Daley made false oral representations to actual and prospective pool participants. For example:

7

- In or about September 2010, Daley met with a prospective pool participant to solicit him to deposit funds with DMG for the purpose of trading crude oil futures contracts. During the meeting, Daley falsely represented that: (1) DMG would generate monthly returns of twenty (20%); (2) he had three to four years of trading experience; (2) DMG never had a losing month; and (3) DMG had $300,000 under management;

- In or about September 2010, while soliciting another prospective pool participant, Daley falsely represented that DMG was making pool participants fifteen to twenty percent (15% -20%) monthly returns through its crude oil trading;

- In or about December 2010, Daley, while soliciting a third prospective pool participant, again falsely represented that DMG pool participants were earning twenty percent (20%) monthly returns through DMG crude oil futures trading. Daley also represented to the same prospective pool participant that DMG's risk was limited because DMG had stop losses in place;

- Through a Skype message with a Pool participant on February 23, 2011, Daley falsely represented that he (Daley) made $72,000 that day trading crude oil; and

- During a conference call on or about March 5, 2011, Daley told multiple pool participants that the DMG fund was up sixty percent (60%) for the year.

8

Daley knew that the above representations were false, misleading, and/or deceptive because during the Relevant Period DMG never maintained any commodity interest trading account in its name or the name of the pool and Daley used the majority of pool participants' funds to pay so-called returns to other pool participants and to pay for his personal expenses. Moreover, during the Relevant Period, Daley's three personal futures trading accounts sustained total net losses of approximately $193,000. In addition, Daley knew that his representations concerning his trading experience were false. Daley never controlled or maintained any commodity trading accounts at any FCM other than the three that he opened in his name in 2010.

During the Relevant Period, Daley failed to disclose to actual and/or prospective pool participants that: (1) his personal trading accounts sustained net losses; (2) only a small portion of pool participants' funds was deposited into futures trading accounts; (3) he misappropriated the majority of pool participants' funds to pay other pool participants' purported returns and to pay for his personal expenses; and (4) he was not properly registered as a CPO. Daley was required to disclose such material information because, in documents and emails and in personal conversations with actual and prospective pool participants, he knowingly or willfully represented that he was generating substantial returns for pool participants by trading crude oil futures contracts. Daley was required to disclose the truth about his trading performance and the misappropriation of pool participants' funds every day that pool participants maintained an open account with DMG.

### G. Daley's Issuance of False Account Statements

During the Relevant Period, Daley further concealed and perpetuated his fraud by distributing to pool participants false account statements via e-mail, U.S. mail, and/or online. These statements reported returns supposedly earned in the pool participants' accounts as a result

9

of Daley's futures trading, when in fact Daley's actual trading resulted in losses virtually every month.

For example, in March 2011, Daley distributed an account statement to a pool participant showing that the pool participant made a 22.88% gross return on the participant's $116,449 deposit for the month of February 2011. In February 2011, Daley distributed an account statement to another pool participant showing a 22.88% gross return on the participant's $18,000 deposit in February 2011. These statements were false because DMG never maintained any trading accounts and Daley's personal trading accounts obtained no profits, but rather sustained net losses of approximately $28,500 for the same month. As a result of these false statements and false profit payments, pool participants maintained and/or deposited more funds with the purported Pool.

### III.   CONCLUSIONS OF LAW

#### A. Defendants Violated Sections 4b(a)(1)(A)-(C) of the Act

From at least January 2010 through November 2011, Daley, while acting as a CPO, violated Sections 4b(a)(1)(A)-(C) of the Act, 7 U.S.C. §§ 6b(a)(1)(A)-(C) (Supp. III 2009), by, among other things, (i) misappropriating pool participants' funds, (ii) fraudulently soliciting pool participants or prospective pool participants, and (iii) making, causing to be made, and distributing reports and statements to pool participants or prospective pool participants that contained false information.

The foregoing acts, omissions, and failures of Daley occurred within the scope of his employment, office, or agency with DMG. Therefore, DMG is liable for these acts, omissions, and failures pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), and Regulation 1.2, 17 C.F.R. § 1.2 (2011).

### B. Defendants Violated Section 4o(1)(A) and (B) of the Act

From at least January 2010 through November 2011, Daley acted as a CPO by soliciting, accepting, or receiving funds from others while engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, for the purpose of, among other things, trading in futures.

Daley violated Section 4o(1)(A) and (B) of the Act, 7 U.S.C. § 6o(1)(A) and (B) (2006), in that he employed or is employing a device, scheme or artifice to defraud actual and prospective pool participants or engaged or is engaging in transactions, practices, or a course of business which operated or operates as a fraud or deceit upon the pool participants or prospective pool participants. The fraudulent acts include (i) misappropriating pool participant funds, (ii) fraudulently soliciting pool participants or prospective pool participants, (iii) making, causing to be made, and distributing reports and statements to pool participants or prospective pool participants that contained false information, and (iv) failing to disclose material information.

The foregoing acts, omissions, and failures of Daley occurred within the scope of his employment, office, or agency with DMG. Therefore, DMG is liable for these acts, omissions, and failures pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006) and Regulation1.2, 17 C.F.R. §1.2 (2011).

### C. Defendants Violated Section 4m(1) of the Act

From at least January 2010 through November 2011, Daley used the telephone, email, U.S. mail, and/or the Internet in or in connection with his business as a CPO while failing to register as a CPO, in violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2006). Each use of the mails or any means or instrumentality of interstate commerce by Daley, while acting as a

CPO including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2006).

The foregoing acts, omissions, and failures of Daley occurred within the scope of his employment, office, or agency with DMG. Therefore, DMG is liable for these acts, omissions, and failures pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006) and Regulation1.2, 17 C.F.R. §1.2 (2011).

### D. Defendants Violated Regulation 4.20(c)

From at least January 2010 through November 2011, Daley violated Regulation 4.20(c), 17 C.F.R. § 4.20(c)(2011), by depositing pool participants' funds into a bank account held in the name of TC Credit Service, LLC, or in the name of other persons or entities, rather than in an account in the name of the Pool.

The foregoing acts, omissions, and failures of Daley occurred within the scope of his employment, office, or agency with DMG. Therefore, DMG is liable for these acts, omissions, and failures pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006) and Regulation1.2, 17 C.F.R. §1.2 (2011).

**THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that Defendants have violated Sections 4b(a)(1)(A)-(C) of the Act, 7 U.S.C. §§ 6b(a)(1)(A)-(C) (Supp. III 2009), as amended by the CRA, and Sections 4o(1) of the Act, 7 U.S.C. § 6o(1) (2006), 4m(1) of the Act, 7 U.S.C. § 6m(1) (2006), and Regulation 4.20(c), 17 C.F.R. §4.20(c) (2011). Therefore, judgment shall be and hereby is entered in favor of the Plaintiff, U.S. Commodity Futures Trading Commission, and against Defendants as follows:

## IV.   PERMANENT INJUNCTION

Pursuant to 7 U.S.C. § 13a-1, the Court may permanently enjoin acts or practices that violate the Act. Accordingly:

**IT IS HEREBY ORDERED THAT:**

1. Based upon and in connection with the foregoing conduct, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), Defendants are permanently restrained, enjoined and prohibited from directly and indirectly:

   a. cheating or defrauding or attempting to cheat or defraud other persons; willfully making or causing to be made to other persons any false report or statement or willfully entering or causing to be entered for other persons and false record; or willfully deceiving or attempting to deceive other persons by any means whatsoever in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person in violation of Sections 4b(a)(1)(A)-(C) of the Act, as amended by the CRA, 7 U.S.C. §§ 6b(a)(1)(A)-(C);

   b. while acting as a CPO, using the mails or any instrumentality of interstate commerce to employ any device, scheme, or artifice to defraud any client participant or prospective client or participant in violation of Section 4o(1) of the Act, 7 U.S.C. § 6o(1) (2006);

   c. while acting as an unregistered CPO, using the mails or any instrumentality of interstate commerce in connection with their business as

a CPO in violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2006);

d. while acting as a CPO, commingling the property of any pool that it operates or that it intends to operate with the property of any other person in violation of Regulation 4.20(c), 17 C.F.R. § 4.20(c) (2011).

2. Defendants are permanently restrained, enjoined, and prohibited from directly or indirectly:

a. trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the Act, as amended by the Dodd-Frank Act, to be codified at 7 U.S.C. § 1a);

b. entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 1.3(hh), 17 C.F.R. § 1.3(hh) (2011)) ("commodity options"), security futures products, swaps (as that term is defined in Section 1a(47) of the Act, as amended, and as further defined by Commission regulation 1.3(xxx), 17 C.F.R. 1.3(xxx)) ("swaps"), and/or foreign currency (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act, as amended by the Dodd-Frank Act, to be codified at 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i)) ("forex contracts") for their own personal account, proprietary account or for any account in which they have a direct or indirect interest;

c. having any commodity futures, options on commodity futures, commodity options, security futures products, swaps, and/or forex contracts traded on their behalf;

    d. controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, security futures products, swaps, and/or forex contracts;

    e. soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, security futures products, swaps, and/or forex contracts;

    f. applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2011); and

    g. acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2011)), agent, officer or employee of any person (as that term is defined in Section 1a of the Act, as amended, to be codified at 7 U.S.C. § 1a) registered, exempted from registration, or required to be registered with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2011).

## V.    RESTITUTION AND CIVIL MONETARY PENALTY

**A.**    **Restitution**

3.    Defendants shall be jointly and severally liable for and pay full restitution in the amount of six hundred fifty four thousand one hundred eighty three dollars ($654,183) ("Restitution Obligation") within ten (10) days of the date of entry of this Order. If the

15

Restitution Obligation is not paid in full within ten (10) days of the date of entry of this Order, then post-judgment interest shall accrue on the Restitution Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961.

4. To effect payment of the Restitution Obligation and the distribution of any restitution payments to Defendants' customers, the Court appoints the National Futures Association ("NFA") as Monitor ("Monitor"). The Monitor shall collect restitution payments from Defendants and make distribution as set forth below. Because the Monitor is acting as an officer of this Court in performing these services, the NFA shall not be liable for any action or inaction arising from NFA's appointment as Monitor, other than actions involving fraud.

5. Defendants shall make Restitution Obligation payments under this Order to the Monitor in the name "Del-Mair Restitution Fund" and shall send such Restitution Obligation payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's check, or bank money order, to the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606, under cover letter that identifies the paying Defendant and the name and docket number of this proceeding. Defendants shall simultaneously transmit copies of the cover letter and the form of payment to: (a) the Director, Division of Enforcement, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581; and (b) the Chief, Office of Cooperative Enforcement, Division of Enforcement, at the same address.

6. The Monitor shall oversee the Restitution Obligation and shall have the discretion to determine the manner of distribution of such funds in an equitable fashion to Defendants' customers identified by the Commission or may defer distribution until such time as the Monitor

deems appropriate. In the event that the amount of Restitution Obligation payments to the Monitor are of a *de minimis* nature such that the Monitor determines that the administrative costs of the making of a distribution to eligible customers is impractical, the Monitor may, in its discretion, treat such restitution payments as civil monetary penalty payments, which the Monitor shall forward to the Commission following instructions for civil monetary penalty payments set forth in Part B below.

7. Defendants shall cooperate with the Monitor as appropriate to provide such information as the Monitor deems necessary and appropriate to identify Defendants' customers to whom the Monitor, in its sole discretion, may determine to include in any plan for distribution of any Restitution Obligation payments. Defendants shall execute any documents necessary to release funds that they have in any repository, bank, investment or other financial institution, wherever located, in order to make partial or total payment toward Restitution Obligation.

8. The amounts payable to each customer shall not limit the ability of any customer from proving that a greater amount is owed from Defendants or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any customer that exist under state or common law.

9. Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each customer of Defendants who suffered a loss is explicitly made an intended third-party beneficiary of this Order and may seek to enforce obedience of this Order to obtain satisfaction of any portion of the Restitution Obligation that has not been paid by Defendants to ensure continued compliance with any provision of this Order and to hold Defendants in contempt for any violations of any provision of this Order.

10. To the extent that any funds accrue to the U.S. Treasury as a result of Defendants'

Case 4:12-cv-01834   Document 15   Filed in TXSD on 12/03/12   Page 18 of 20
Case 4:12-cv-01834   Document 14-3   Filed in TXSD on 11/07/12   Page 18 of 20

Restitution Obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set for the above.

**B.     Civil Monetary Penalty**

11.     Defendants shall be jointly and severally liable for and pay to the Commission a civil monetary penalty in the amount of one million nine hundred ninety-five thousand dollars ($1,995,000) ("CMP Obligation") within ten (10) days of the date of this Order. If Defendants do not pay his CMP Obligation in full within ten (10) days of the date of entry of this Order, then post-judgment interest shall accrue on his CMP obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961.

12.     Defendants shall pay their CMP Obligation by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> Commodity Futures Trading Commission
> Division of Enforcement
> Attn: Accounts Receivable – AMZ-340
> E-mail Box: 9-AMC-AMZ-AR-CFTC
> DOT/FAA/MMAC
> 6500 S. MacArthur Blvd.
> Oklahoma City, Oklahoma 73169
> Telephone: 405-954-5644

If payment is to be made by electronic funds transfer, Defendants shall contact Linda Zurhorst or her successor at the above address to receive payment instructions and shall fully comply with those instructions. Defendants shall accompany payment of the penalty with a cover letter that identifies the Defendants and the name and docket number of this proceeding. Defendants shall

simultaneously transmit copies of the cover letter and the form of payment to the Director, Division of Enforcement, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, N.W., Washington, D.C. 20581, and the Chief, Office of Cooperative Enforcement, at the same address.

### C.  Provisions Related to Monetary Sanctions

14.   Satisfaction: Upon full satisfaction of the Defendants' Restitution Obligation and CMP Obligation, a satisfaction of judgment will be entered into as to the Defendants.

15.   Partial Satisfaction: Any acceptance by the Commission or Monitor of partial payment of the Defendants' Restitution Obligation or CMP Obligation shall not be deemed a waiver of their obligation to make further payments pursuant to this Order, or a waiver of the Commission's right to seek to compel payment of any remaining balance.

## VI.   MISCELLANEOUS PROVISIONS

**IT IS FURTHER ORDERED THAT:**

16.   Notices: All notices required to be given by any provision in this Order shall be sent certified mail, return receipt requested, as follows:

>   Notice to the Commission:
>
>   Attention - Director of Enforcement
>   Commodity Futures Trading Commission
>   Division of Enforcement
>   1155 21st Street N.W.
>   Washington, DC 20581

All such notices to the Commission shall reference the name and docket number of this action.

17.   Invalidation: If any provision of this Order or if the application of any provision or circumstance is held invalid, then the remainder of this Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

18.   Continuing Jurisdiction of this Court: This Court shall retain jurisdiction of this

action to ensure compliance with this Order and for all other purposes related to this action, including any motion by Defendants to modify or for relief from the terms of this Order.

19. Copies of this Order may be served by any means, including facsimile transmission, e-mail, United Parcel Service and Federal Express, upon Defendants, and any other entity or person that may be subject to any provision of this Order.

**IT IS FURTHER ORDERED** that there being no just cause for delay, the Clerk of the Court shall enter final judgment against Defendants forthwith.

**IT IS SO ORDERED** on this _3rd_ day of _December_ 2012.

HON. KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE